UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FAIR HOUSING CENTER OF WASHTENAW
COUNTY, INC., d/b/a FAIR HOUSING CENTER
OF SOUTHEASTERN MICHIGAN, INC.,

       Plaintiff,

                                         Case No. 07-10262

-vs-                                     HON. AVERN COHN

TOWN AND COUNTRY APARTMENTS,
ANN ARBOR, L.L.C., d/b/a TOWN AND
COUNTRY APARTMENTS,

       Defendant.

_____/

**AMENDED[1] MEMORANDUM AND ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. Introduction**

      This is a fair housing case. The plaintiff, Fair Housing Center of Washtenaw

County, Inc. (FHC), is suing defendant Town & Country Apartments—Ann Arbor, L.L.C.

(Town & Country), for discrimination based on race. The complaint is in three counts:

      (I) Violation of the Civil Rights Act of 1866 and 1870, 42 U.S.C. §§ 1981, 1982;

      (II) Violation of the Fair Housing Amendments Act of 1988 (FHAA) (which

amended the Fair Housing Act of 1968 (FHA)), 42 U.S.C. §§ 3604, 3617; and

      (III) Violation Michigan's Elliot-Larsen Civil Rights Act, M.C.L. §§ 37.2501 et seq.

(ELCRA).

---

[1] Amended on page 3 to change "Tester Assignment Form" to "Site-Visit Rental Report Form," page 7 to correct the spelling of O'Loughlin's name, and page 8 to correct Kisch's title and the spelling of O'Loughlin's name, along with the account of Toplin's second visit and Kisch's phone call to Lake.

FHC says Town & Country's discriminatory acts and unfair housing practices have directly obstructed, frustrated, and damaged FHC in its pursuit of equal housing opportunities to all persons without regard to race or color. FHC adds that its mission of eradicating unlawful housing discrimination fosters an ultimate goal of abolishing its own existence and that Town & Country's practices not only prolong FHC's existence but also cause FHC to divert scarce resources from other activities.

Before the Court is Town & Country's motion for summary judgment. For the following reasons, the motion is DENIED.

## II. Facts

### A. Background

#### 1. Town & Country

Town & Country has 97 apartments comprising one-bedroom (1BR) and two-bedroom (2BR) units in several buildings. Each unit's occupancy and rental payments are tracked on the company's electronic rent roll called "YARDI." An apartment generally takes one week to ten days to prepare for new occupancy. Except for a brief period in 2001, Town & Country always had vacant apartments.

During the events in question, only three of Town & Country's six equal-share members had any active involvement in the operation and management of the complex: Alan Gorosh (Alan), Bruce Gorosh, and Neil Gorosh.

Alan acted as Town & Country's property manager from 1997 until September 2005, when the complex hired a management company, Magar & Company. As property manager, Alan was on site once or twice a week. He communicated with the

2

resident manager whose job it was to discuss the features and availability of rental units with prospective tenants and take rental applications.  Alan made the final decision on whether to rent to a particular applicant.

Bill and Barbara Clark were the resident managers until their retirement in 2001, when Janet Lake began serving as resident manager.  Lake left voluntarily in May 2006 for reasons other than the fair housing tests.

### 2.  FHC

When FHC receives a housing discrimination complaint it responds by sending testers.  The testers consist of matched pairs, one African-American and one Caucasian.  The testers, purportedly desiring to rent an apartment, meet with the resident manager, discuss the possibility of renting, and then record the resident manager's response to their inquiry on a "Site-Visit Rental Report Form" (Tester Form).

The responses recorded on the Tester Forms from the African-American tester and the Caucasian tester are compared.  A Coordinator of Investigations then records the tests on a "Test Comparison Sheet" (Comparison Sheet), categorizing each test as either:

(1) "E"—evidence of unlawful discrimination based on protected class status;

(2) "Inc"—inconclusive; or

(3) "N"—no evidence.

### B.  2001 Tests

In response to a complaint by Felton Luckett (Luckett) of racial discrimination at Town & Country, FHC sent five pairs of testers from February 2001 through July 2001.

Each of the testers met with resident manager Bill and/or Barbara Clark to inquire into available apartments.  The Tester Forms show the following.

### 1. Urbanik-Vaughn

On February 9, 2001, at 3:00 p.m., Robert Urbanik, a Caucasian, was told that one 2BR unit was ready and another would be available in a few days.

At 6:30 p.m. that same day, Lawyer Vaughn, an African-American, was told that there were no 2BR units available.

### 2. Richberg-Kraut

On February 23, 2001, at 12:15 p.m., Dawn Richberg, an African-American, was told that there were no 2BR units available, but that there may be one available in mid-March or mid-April.  Richberg was also told that no 1BR units were available.

At 3:30 p.m. that same day, Ruth Kraut, a Caucasian, was told that there were no 2BR units available but that one would be available in two weeks to one month.  Kraut was also told that there were 1BR units currently available.  She was told that units become open at the end of the month and are available for occupancy by the 11th or 12th of the month.

### 3. Hoth-Thomas

On March 20, 2001, at 2:10 p.m., Bradley Hoth, a Caucasian, was told that there was a 1BR unit that might be available "tomorrow."  Hoth was also told about a deluxe 1BR unit and about two 1BR units that would become available at the end of the month after two tenants moved out.

At 6:12 p.m. that same day, Peter Thomas, an African-American, was told that

4

there possibly would be one unit available the next day, depending on whether someone followed through with a security deposit.  He was told to call back the next morning.  Thomas was also offered information about a deluxe 1BR unit.

### 4.  Doughty-Moses

On April 4, 2001, at 4:00 p.m., Joan Doughty, a Caucasian, was told that one 2BR unit would be available in ten days to two weeks.  Doughty was shown a second unit that just needed to be cleaned and would be ready for immediate occupancy.  Doughty was told that it took just five minutes to process an application.

At 4:40 p.m. that same day, Rose Moses, an African-American, was told that two apartment units, consisting of 1BR and 2BR apartment units would be available in about two to three weeks.  Moses was also told that there was a two-day waiting list for submitting an application.

### 5.  Bridges-Hendricks

On July 17, 2001, at 12:10 p.m., Wallace Bridges, an African-American, was told there were no 2BR units available until September.  Bridges was told that an empty one was already claimed.  Bridges was provided no information concerning 2BR units.

At 1:25 p.m. that same day, Eric Hendricks, a Caucasian, was told that no 2BR units were available, but that one might be available in mid-August and that a 1BR unit would be vacant by August 1.

### C.  Luckett Sues Town & Country

In January 2003 Luckett sued Town & Country.

5

In September 2003 FHC sent a letter with notice of the 2001 tests and violations, along with copies of the Tester Forms and Comparison Sheets, to Michael Dorocak, an associate of Bruce Gorosh.  Bruce acknowledged receiving the letter and tests and forwarding them to Alan.  The letter indicated that four of the tests were reported as "E" (evidence) and the remaining rest was reported as "Inc" (inconclusive).

On March 1, 2004, FHC sent another letter in which it advised Town & Country to conduct fair housing training to help prevent future discrimination claims.  Nothing in the record indicates that the Goroshes ever conducted such training at Town & Country.

On March 9, 2004, Luckett and Town & Country settled and stipulated to dismissal with prejudice.

### D.  2005–2006 Tests

In July 2005, Stephanie Penn, a tenant at Town & Country, complained to FHC of discrimination at the complex.  Under Discrimination Types on the complaint form, an X is marked beside Race, Income Source, and Other, specified as "S.O.," or sexual orientation.  In response to Penn's complaint, FHC conducted another series of racial tests from August 2005 through June 2006.[2]  All testers except the last pair met with Lake.  The Testing Forms show the following.

### 1.  Spurlock-Caldwell

---

[2]  Town & Country points out that Penn thought she was discriminated against based on sexual orientation.  Sexual orientation is not protected under the FHA.  FHC conducted racial discrimination tests because either Penn or her partner is African-American.

On August 18, 2005, at 2:00 p.m., Kim Spurlock, a Caucasian, was told there were no 2BR units available and that one 2BR unit would possibly be available soon. Spurlock was shown one of the 2BR units.

At 3:33 p.m. that same day, Tiffany Caldwell, an African-American, was told about a 2BR unit that needed to be cleaned and was not ready to be shown. Caldwell was told to come back on Monday to see the unit.

According to the August 2005 rent roll, there were 17 vacant apartments. Eight of the 17 were 2BR units.

### 2. Redman-Arawole

On October 7, 2005, at 1:04 p.m., Kate Redman, a Caucasian, was told about a 2BR unit and a deluxe 1BR unit that were vacant and immediately available. Redman was shown the interior of both units and was told that she could move into the 2BR apartment that day and that the 1BR unit would likewise be ready for move-in immediately.

At 3:53 p.m. that same day, Joyce Arawole, an African-American, was told there were no 2BR units available, a deluxe 1BR unit would possibly be available by mid-October, and a 2BR unit might be available by November 1.

The October 2005 rent roll showed 22 available apartments. Of the 22, nine were vacant 2BR units.

### 3. O'Loughlin-Toplin

7

On May 8, 2006, at 1:45 p.m., Karen O'Loughlin, a Caucasian, was given a rental application and shown a vacant, immediately available second-floor 2BR unit. O'Loughlin was also told about a first-floor 2BR unit that might become available in July.

At 3:50 p.m. that same day, Kathleen Toplin, an African-American, tried to meet with Lake but was never interviewed.

Toplin returned the next day, May 9, and tried for 30 minutes to meet with Lake. She buzzed repeatedly to gain entrance to the management office but was not admitted. Her visit ended at 4:00 p.m.

At 4:35 p.m. that same day, Pamela Kisch, Executive Director of FHC, called Town & Country and spoke to Lake, confirming that Lake was in the office.

Lake voluntarily resigned on May 21, 2006, for reasons unrelated to FHC's tests.

### 4. Sugarman-Murphy

On June 8, 2006, at 2:10 p.m., Cheryl Sugarman, a Caucasian, was given a key to look at a 1BR unit. The resident manager[3] gave Sugarman an application and told her to call back the next week regarding the availability of a 2BR apartment.

At 3:35 p.m. that same day, Venita Murphy, an African-American, was told that the last unit was rented two hours before and that there was nothing else available. Murphy asked if she could call back the next week; the resident manager said yes but not to expect anything to be available.

According to the June 2006 rent roll, both 1BR and 2BR apartments were vacant and there were 27 total vacant apartments.

---

[3] The record is not clear as to the name of the resident manager who took over when Lake resigned.

### III.  Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate when the evidence submitted shows that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party has the burden of showing the absence of a genuine issue of material fact as to an essential element.  Waters v. City of Morristown, 242 F.3d 252, 258 (6th Cir. 2001).  All facts and inferences should be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

### B.  Discrimination Under the FHA

"Congress'[s] intention in passing the [Fair Housing] Act was to end the unfairness of racial discrimination forever; it should, therefore, be liberally construed." Zuch v. Hussey, 394 F. Supp. 1028, 1046 (E.D. Mich. 1975).

It is unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."  42 U.S.C. § 3604(d).  Either disparate treatment or disparate impact may show discrimination. Arthur v. City of Toledo, 782 F.2d 565, 574–75 (6th Cir. 1986).

Standing to sue under the FHA is "as broad as is permitted by Article III of the Constitution."  Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91,109 (1979).  Under the FHA, a plaintiff need only show (1) an injury in fact to plaintiff (2) causally connected

9

to the defendant's conduct (3) that is likely to be redressed by a favorable ruling.
Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230–31 (6th Cir. 2003) (citing Lujan
v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

The courts have extended standing for FHA claims to fair housing organizations.
Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); Hooker v. Weathers, 990
F.2d 913, 915 (6th Cir. 1993) (fair housing organization had standing because it
"devoted resources to investigating the defendants' practices and alleges that it has
confirmed that defendants do discriminate on the basis of familial status").

### IV.  Analysis

### A.  FHC's Standing

For the first time, Town & Country argues in its reply that FHC has failed to
establish a *prima facie* case of discrimination.  FHC appears to interpret this as an
assertion against standing.  As noted under III.B. above, the Supreme Court and the
Sixth Circuit have extended standing to assert FHA claims to fair housing organizations.

### B.  Admissibility of the 2001 Tests

Town & Country wants the 2001 tests stricken because they were not conducted
within the applicable statutes of limitations[4] and the continuing violations doctrine, which
would toll the statute of limitations, does not apply to the tests.

The standard to determine whether the 2001 tests fall within the continuing
violations doctrine has three parts:  (1) the defendant's wrongful conduct continued after
the event that began the pattern; (2) the injury to the plaintiff must continue to accrue

---

[4] Two years for the FHA claim and three years for the 42 U.S.C. §§ 1981, 1982 and
ELCRA claims.

after that event; and (3) further injury to the plaintiff must have been avoidable if the defendant had at any time ceased its wrongful conduct.  Paschal v. Flagstar Bank, FSB, 295 F.3d 565, 572 (6th Cir. 2002).

The last of the 2001 tests was conducted in July 2001.  The first of the 2005–2006 tests was conducted in August 2005.  FHC says the pattern of discrimination continued through 2003 and 2004 but offers no evidence for 2003 and 2004 and makes no mention of 2002.

The 2001 tests fail to meet prong (2) of the continuing violations doctrine because the gap of four years between the test sequences breaks the evidentiary chain of continued accrual of injury.

However, the 2001 tests are admissible as background evidence to provide context in explaining why FHC conducted the 2005–2006 tests.  They are also admissible under Fed. R. Evid. 404(b) as prior acts to establish proof of motive, opportunity, or intent.

### C.  Admissibility of the 2005–2006 Tests

Town & Country argues that the 2005–2006 tests are hearsay within hearsay because FHC has not produced the testers for deposition to confirm the authenticity of the tests.  This argument is without merit.

Both Town & Country and FHC have conducted several depositions, including those of six of the eight 2005–2006 testers, or 75%.  The failure to produce the other two testers is not fatal to the admission of the tests.  As this Court found in Laudon v. Loos, 694 F. Supp. 253, 254 & n.2 (E.D. Mich. 1988) (citing, respectively, United States

11

v. Hathaway, 798 F.2d 902, 905–06 (6th Cir.1986), and Estate of Shafer v. Comm'r of Internal Revenue, 749 F.2d 1216, 1219 (6th Cir.1984)), fair housing testing records may be admitted under Fed. R. Evid. 803(6), the business records exception, and 801(d)(2), admissions of a party opponent.  Further, the deponents, including the three Goreshes and Lake, have provided direct evidence of their recalled personal observations.

### D.  Prima Facie Case and Burden Shifting

The McDonnell Douglas[5] burden shifting approach may be used where a plaintiff provides circumstantial evidence of discrimination to establish a *prima facie* case of discrimination.  Selden Apartments v. U.S. Dep't of Housing & Urban Dev., 785 F.2d 152, 159 (6th Cir. 1986).  Sometimes it is true that, as Town & Country says in its reply, in order to establish a *prima facie* case of housing discrimination, a plaintiff must show:

(1)  that he or she is a member of a racial minority,
(2)  that he or she applied for and was qualified to rent or purchase certain property or housing,
(3)  that he or she was rejected, and
(4)  that the housing or rental property remained available thereafter.

Mencer v. Princeton Square Apartments, 228 F.3d 631, 634–35 (6th Cir. 2000).  But Mencer is distinguished—not because, as FHC says in sur-reply, the latter dealt with a real estate purchase.  Mencer, like this case, also dealt with an apartment rental.  The distinction is that Mencer was brought under section 804(a) of the FHA.

This case, however, falls under section 804(d), which makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status,

---

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

or national origin that any dwelling is not available for inspection, sale, or rental when

such dwelling is in fact so available."  42 U.S.C. § 3604(d).

> That the tester may have approached the real estate agent fully expecting
> that he would receive false information, and without any intention of
> buying or renting a home, does not negate the simple fact of injury . . . .
> Congress plainly omitted [a bona fide offer] requirement insofar as it
> banned discriminatory representations in § 804(d).

Havens Realty, 455 U.S. at 374.  Contrary to Town & Country's assertion, then, the

FHA does not require that testers make an offer or return a completed application.  And

FHC is correct that misrepresentations alone based on race regarding availability of

units are sufficient to establish an FHA violation.  See id. at 368 & n.4, 378–89

(upholding fair housing organization's independent standing to sue where sole

complaint was: "Camelot Townhouses is an apartment complex predominantly occupied

by whites.  Coles [an African-American plaintiff] was informed that no apartments were

available in the Camelot complex.  He was told that an apartment was available in the

adjoining Colonial Court complex.  The Colonial complex is integrated.").

If FHC establishes a *prima facie* case of discrimination by circumstantial

evidence, a presumption of unlawful discrimination arises.  Tex. Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 254 (1981).

Town & Country can rebut the presumption by producing evidence that the action

was taken "for a legitimate, nondiscriminatory reason."  McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973).  "The defendant need not persuade the court that it

was actually motivated by the proffered reasons."  St. Mary's Honor Ctr. v. Hicks, 509

13

U.S. 502, 510 (1993).  Although Town & Country has this burden of production, at all times the burden of persuasion is on FHC.  Id. at 506-07.

If Town & Country rebuts the presumption, FHC must show that Town & Country's reasons were a pretext for discrimination and that it intended to discriminate.  See Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1166 (6th Cir. 1996).  FHC must demonstrate that the proffered reasons: (1) had no basis in fact, (2) were not the actual reasons, or (3) were insufficient to explain the action.  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

### E.  Questions of Material Fact

The 2005–2006 test results and the depositions of Caldwell, Toplin, Sugarman, and Murphy present evidence of questions of material fact regarding whether Town & Country practiced racial discrimination in renting apartments.

Town & Country argues for the first time in its reply brief that its "diverse tenant population" in July 2005 shows that it did not discriminate.  Even if the Court were to consider an argument raised for the first time in a reply brief, see Resolution Trust Corp. v. Townsend Assoc. Ltd. P'ship, 840 F. Supp. 1127, 1142 n.14 (E.D. Mich. 1993), it would analogize to the line of Supreme Court Title VII cases that make clear that an equal opportunity must be provided to each applicant, regardless of race and regardless of what balance may exist in the work force, Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579 (1978); Connecticut v. Teal, 457 U.S. 440, 454 (1971); see also Asbury v. Brougham, 866 F.2d 1276, 1281–82 & n.5 (10th Cir. 1989) (upholding jury's finding of

14

discrimination despite two consecutive years with, respectively, 20% and 25% black occupancy of apartment complex).

Town & Country also raises for the first time in its reply a distinction between "vacant" and "available" units.  Even if this was a real distinction during a manager's conversation with an applicant, some units were reported as available or potentially available to white testers but not to African-American testers (Redman-Arawole, Sugarman-Murphy).  Moreover, Lake testified that it usually took about one-and-one-half weeks to prepare a unit for occupancy.  Further, rent rolls show numerous available units at the time African-American testers visited Town & Country.[6, 7]

### E.  Punitive Damages

Town & Country has asked the Court to strike FHC's request for punitive damages based on the absence of any economic damages suffered by FHC.

Punitive damages are permitted in FHA cases.  Szwast v. Carlton Apartments, 102 F. Supp. 2d 777, 780 ( E.D. Mich. 2000).  "[R]eckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages."  Id. (internal

---

[6] FHC also points out that the YARDI electronic data, which are the subject of a motion to compel, contain maintenance and repair information on specific units.

[7] Town & Country argues in its reply that FHC's counsel should be disqualified as a "witness" under Mich. R. Prof. Conduct 3.7 and Aleynu, Inc. v. Universal Prop. Dev. & Acquisition Corp., 564 F. Supp. 2d 751 (E.D. Mich. 2008).  This argument is not properly part of a summary judgment argument.  Further, "[A]ttorneys are not necessary witnesses if the substance of their testimony can be elicited from other witnesses and the party seeking disqualification did not previously state an intent to call the attorney as a witness."  Aleynu, 564 F. Supp. 2d at 757 (quoting People v. Tesen, 276 Mich. App. 134, 143 (2007)).  Discovery has closed and Town & Country has never expressed an intent to call FHC's counsel as a witness.

quotation marks omitted) (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 51 (1983), a case under

42 U.S.C. § 1983, in application to the fair housing context).

### V.  Conclusion

For the foregoing reasons, Town & Country's motion for summary judgment has

been denied.  The case must go forward.

SO ORDERED.


 s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  February 27, 2009


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, February 27, 2009, by electronic and/or ordinary mail.


 s/Julie Owens_____
Case Manager, (313) 234-5160

16